UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COLLEEN TROSETH,

                Plaintiff,

     v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                Defendant.

CASE NO.    C07-5473KLS

ORDER REVERSING THE
COMMISSIONER'S DECISION
TO DENY BENEFITS AND
REMANDING FOR FURTHER
PROCEEDINGS

       Plaintiff, Colleen Troseth, has brought this matter for judicial review of the denial of her

applications for disability insurance and supplemental security income ("SSI") benefits.  The parties have

consented to have this matter be heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. §

636(c), Federal Rule of Civil Procedure 73 and Local Rule MJR 13.  After reviewing the parties' briefs

and the remaining record, the Court hereby finds and ORDERS as follows:

<u>FACTUAL AND PROCEDURAL HISTORY</u>

       Plaintiff currently is 38 years old.[1] Tr. 46.  She has a tenth grade education and past work

experience as a housekeeping cleaner, bartender, cook, waitress, and restaurant manager. Tr. 32, 67.

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

ORDER
Page - 1

1   On November 10, 2003, plaintiff filed applications for disability insurance and SSI benefits,

2   alleging disability as of October 20, 2001, due to post traumatic stress disorder ("PTSD"), depression,

3   suicidal ideation, paranoia, anxiety, migraine headaches, deformity of her eardrum and lower extremity

4   weakness. Tr. 20, 65-66, 81, 113, 386-88.  Her applications were denied initially and on reconsideration.

5   Tr. 46-47, 52, 56.  A hearing was held before an administrative law judge ("ALJ") on January 10, 2007, at

6   which plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational

7   expert. Tr. 399-445.

8   On March 29, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding

9   specifically in relevant part:

10   (1)   at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability;

12   (2)   at step two, plaintiff had "severe" impairments consisting of a chronic pain syndrome, major depression, a personality disorder, PTSD, delayed onset, and a substance addiction disorder, in reported remission;

13   (3)   at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

15   (4)   at step four, plaintiff had the residual functional capacity to perform a modified range of light work, which precluded her from performing her past relevant work; and

17   (5)   at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

18
19   Tr. 20-34.  Plaintiff's request for review was denied by the Appeals Council on August 6, 2007, making

20   the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 404.981, § 416.1481.

21   On September 10, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's

22   decision. (Dkt. #1-#3).  The administrative record was filed with the Court on December 10, 2007. (Dkt.

23   #12).  Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits or, in

24   the alternative, for further administrative proceedings for the following reasons:

25   (a)   the ALJ erred in evaluating the medical evidence in the record;

26   (b)   the ALJ erred in assessing plaintiff's credibility; and

27
28   _____

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

1

2

(c)     the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The Court agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, hereby finds that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.     The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences

1    from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

2           The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

3    either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

4    treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

5    and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However,

6    the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>,

7    739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only

8    explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d

9    700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

10          In general, more weight is given to a treating physician's opinion than to the opinions of those who

11   do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

12   a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings"

13   or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190,

14   1195 (9th Cir.,2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242

15   F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

16   opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion

17   may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u>

18   at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

19          A.     Dr. Crabbe and Dr. Sattar

20          In late February 2003, Richard Crabbe, M.D, conducted a psychiatric evaluation of plaintiff.

21   Plaintiff reported that she had occasional suicidal thoughts, but had no current suicidal intent or plan at the

22   time of the evaluation. Tr. 285.  Plaintiff did feel "anxious sometimes" and had "the odd panic attack" –

23   although neither was a major problem for her – and she denied symptoms of mania and psychosis. Tr. 284.

24   On her mental status examination, plaintiff had good eye contact, exhibited no retardation or agitation, and

25   her speech was normal. Tr. 285.  Plaintiff related appropriately to Dr. Crabbe, who found she had no

26   formal thought disorder or disorder in the content of her thinking. <u>Id.</u>

27          In addition, plaintiff denied having any obsessions or compulsions, achieved a perfect score "with

28   relative ease" on her "mini mental status exam," and was "judged to be of average intelligence, with fair

judgment and some insight into her problems." Id.  Dr. Crabbe diagnosed plaintiff with a recurrent major depressive disorder, without psychotic features, methamphetamine abuse, and alcohol abuse. Tr. 286.  Dr. Crabbe also gave plaintiff a global assessment of functioning ("GAF") score of 50. Id.

In mid-May 2004, Anjan Sattar, M.D., performed a psychiatric evaluation of plaintiff, who reported that while she had been having some suicidal ideation, she had had "none for the last two months." Tr. 247.  Plaintiff reported "some difficulties with anger control problems," but added that this had improved. Id.  She also reported hearing voices, but denied any "command hallucinations lately." Id. In addition, plaintiff denied having any delusions, and reported that while she had "a previous history of having delusions," she attributed those to "being high on methamphetamine." Id.  Plaintiff further denied both paranoia symptoms and visual hallucinations. Id.  In terms of auditory hallucinations, she reported that they were "more when she was doing drugs" as well. Id.  Lastly, plaintiff reported that her PTSD-related nightmares were "a lot less frequent than in the past," she denied having any flashbacks, and she did not appear to be responding to any internal stimuli. Id.

On mental status examination, plaintiff was alert and oriented, had normal speech except for some decrease in its rate, and maintained fair eye contact. Tr. 248.  Plaintiff's thought processes were coherent and goal-directed, and her insight, judgment and cognition all appeared to be "fair to good." Id.  Dr. Sattar found her to have "symptomatology most consistent with PTSD and Depression" and "a major problem with Polysubstance Dependence," although he did note plaintiff reported that she had been able to "keep herself clean and sober for a significant period." Id.  Dr. Sattar further opined as follows:

> Despite that she continues to experience the signs and symptoms of both depression and PTSD.  The origin of her psychotic symptoms it is not entirely clear from an etiologic point of view.  From what she reports it appeared that her psychotic symptoms were most likely drug induced. . . . [T]he patient may have some personality problems which may explain some of her auditory hallucinations.  However at this time there is not enough evidence to make such a diagnosis.

Id.  Plaintiff was diagnosed with a severe, recurrent major depressive disorder, polysubstance dependence in full remission and a GAF score of 50. Tr. 249.  Substantially similar self-reports by plaintiff and findings from Dr. Sattar were provided in late April 2006. Tr. 376-77.  At that time, Dr. Sattar diagnosed her with PTSD, a recurrent major depressive disorder, amphetamine abuse in full sustained remission, alcohol abuse in early remission, a borderline personality disorder, and, again, a GAF score of 50.

Plaintiff argues that while the ALJ summarized the findings and diagnoses of Dr. Crabbe and Dr.

Sattar in his decision (Tr. 25-27), he provided no analysis thereof, which was error.  Specifically, plaintiff points to the GAF score of 50 with which both psychiatrists diagnosed her, which she argues indicates she has serious symptoms or a serious impairment in her functioning, and which she asserts is evidence that the ALJ was required to evaluate.  The Court agrees.  "A GAF score of 50 'reflects serious limitations in the patient's general ability to perform basic tasks of daily life.'" England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007) (quoting Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir.2003)); see also Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) ("A GAF score of 41-50 indicates '[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning,' such as inability to keep a job.") (quoting Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir.2004) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34)).

A GAF score thus is "relevant evidence" of a claimant's ability to function mentally. England, 490 F.3d at 1023, n.8.  It is "a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" Pisciotta, 500 F.3d at 1076 n.1.  Thus, while a GAF score "is not essential" to the accuracy of, say, an ALJ's assessment of a claimant's residual functional capacity to perform work, that score certainly may be "of considerable help" thereto. Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002).  Despite the fairly unremarkable self-reports and mental status examinations gleaned from Dr. Crabbe's and Dr. Sattar's evaluations, both psychiatrists did assess a GAF score of 50, indicating, as noted above, serious impairment.  Those scores also are quite consistent with the majority of those assessed by other medical sources in the record. See Tr. 155, 172, 183, 194, 202, 229, 252, 263, 298, 359, 385I.  As such, they should have been considered.

Defendant argues that the GAF scale is not directly correlated to the severity requirements for the mental disorders set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Defendant further argues that neither Dr. Crabbe nor Dr. Sattar explained why they assessed plaintiff with a GAF score of 50.  As such, defendant asserts, the bases for their GAF score assessments remain ambiguous, which left the ALJ with the task of resolving that ambiguity.  It is true, as noted above, that the ALJ has the sole responsibility for resolving ambiguities in the medical evidence. Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642.  Here, however, it is not at all clear that the ALJ assumed that responsibility.  Indeed, without a discussion by the ALJ of the above GAF scores, it is impossible to know what the ALJ did with respect thereto.

B.    Dr. Bremer

In mid-March 2006, plaintiff underwent a psychological evaluation performed by Jeff Bremer, Ph.D., who diagnosed her with major depression, PTSD, a personality disorder, and methamphetamine, cocaine and alcohol dependency in reported remission. Tr. 301.  Dr. Bremer found plaintiff to be markedly limited in her ability to relate appropriately to co-workers and supervisors, interact appropriately in public contacts and respond appropriately to and tolerate the pressures and expectations of a normal work setting, and moderately limited in her ability to control physical or motor movements and maintain appropriate behavior. Tr. 302.  Dr. Bremer estimated that plaintiff would remain impaired to the degree noted above for a minimum of 12 months. Tr. 303.

Plaintiff was evaluated again by Dr. Bremer in mid-January 2007.  At the time of the evaluation, plaintiff reported that she "was having a panic attack," and it appeared to Dr. Bremer that she was having one which lasted for "about 30 minutes or so." Tr. 385G.  Even after that, Dr. Bremer noted that plaintiff "cried frequently" throughout the evaluation, maintained minimal eye contact, and was emotionally labile, but generally depressed. Id.  She was, however, alert and oriented. Id.  On psychological testing, plaintiff's general level of intellectual functioning was "solidly in the average range." Tr. 385H.

Dr. Bremer diagnosed plaintiff this time with moderate, recurrent major depression, without psychotic features, an anxiety disorder with PTSD symptomatology, and methamphetamine, cocaine and alcohol dependence, all in reported remission, and gave her a GAF score of 50, both current and as being the highest within the past year. Tr. 385I.  Dr. Bremer further opined in relevant part as follows:

> Ms. Troseth presents as . . . emotionally labile (though primarily depressed), socially withdrawn . . . of solidly average intelligence with a pervasive pattern of instability in interpersonal relationships, self-image, and affect, with marked impulsivity and recurrent suicidal behavior, affecting to an at least marked degree her abilities to interact socially and to adapt to work and social settings. . . .

> Ms. Troseth has struggled to stay clean and sober, following an extensive history of abusive substances and alcohol.  Currently, she claims to be about one year clean and sober.  In the context of characterological functioning (borderline personality) her current relapses might be viewed as an example of impulsive and ultimately self-defeating behavior, much the way as her recurrent suicide attempts.  In other words, her primary disability is psychiatric – first, her Borderline Personality Disorder and, secondarily, Affective (Anxiety and Depressive) Disorder.  Levels of dysfunction persist, unfortunately, despite reported compliance with psychiatric and psychotherapeutic services.  Prognosis, as a result, is, at best, guarded.

> . . . Ms. Troseth's personality style – her personality disorder – has existed since at least adolescence and will likely endure.  In addition, she is also presenting with signs and symptoms of Posttraumatic Stress Disorder . . . She appears capable of understanding,

remembering, and carrying out detailed instructions, but would likely have difficulty working in coordination with or in proximity to others without being distracted by them, and (especially) interacting appropriately with the general public, coworkers and peers, and responding appropriately to changes in a work setting. . . .

Tr. 385J.

At the same time, Dr. Bremer completed a mental medical source assessment form, in which he found plaintiff to be severely limited in her ability to interact appropriately with the general public and get along with co-workers or peers, and markedly limited in her ability to work in coordination with or proximity to others, complete a normal workday or workweek, perform at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in a work setting. Tr. 385-K-L.  In addition, Dr. Bremer found plaintiff to be moderately limited in her ability to: maintain attention and concentration; perform activities within a schedule; maintain regular attendance; be punctual; sustain an ordinary routine; ask simple questions or request assistance; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; use public transportation; set realistic goals; and make plans independently of others. Id.

The ALJ addressed Dr. Bremer's opinions as follows:

The undersigned discounts Dr. Bremer's March 2006 DSHS opinion because his assessments are not supported by any explanations.

The undersigned also discounts Dr. Bremer's January 2007 opinion.  As observed by Dr. Bremer at the evaluation, the claimant was anxious and crying.  She stated that she was having a panic attack; it took her about 30 minutes to clam down.  She reported that she had intentionally not put on eye shadow in the morning because she anticipated being "emotional."  Because of the timing of the evaluation, which occurred after the hearing, the claimant knew that the evaluation would be significant in determining her eligibility for disability benefits.  Given that she appeared at the evaluation in a hyper emotional state and even admitted to Dr. Bremer that she had anticipated becoming "emotional," the undersigned finds that her outward appearance at the interview does not necessarily reflect her actual functioning under ordinary circumstances.  The undersigned also notes that even in her tearful state, the claimant managed to perform very well on the formal portion of the mental status examination and obtain scores on several cognitive tests that fell solidly in the average range.  This suggests that under the limitations posed by the undersigned, the claimant is able to respond appropriately to changes with a routine work setting and complete a normal workday and workweek at a consistent pace and without interruption from her mental impairments.

Additionally, the undersigned discounts Dr. Bremer's assessment of the claimant's social interaction skills because it is inconsistent with the reported activities.  As discussed above, the claimant lives with her mother, goes to church, and is able to interact with her mother, sister, a few friends, and two teenage children.

Tr. 31.

Plaintiff asserts the ALJ's rejection of Dr. Bremer's mid-March 2006 opinion on the basis that his assessments were not supported by any written explanations is not completely accurate, in that Dr. Bremer did provide hand-written, albeit largely illegible, notes throughout the state agency form he used to present his assessments in addition to the boxes he checked.  It is true that Dr. Bremer did make some notations in addition to the boxes he checked.  Those notations, however, provide little in the way of explanations for the functional assessments and opinions he gave.  The Court also finds that while those notations are not the easiest to discern, they are more legible than is being claimed here by plaintiff.

As noted above, an ALJ need not accept the opinion of even a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings." Batson, 359 F.3d at 1195; Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149.  Given that Dr. Bremer's assessments came primarily in the form of checked boxes, with little in the way of explanatory support, the ALJ did not err in discounting his mid-March 2006 opinion for this reason.  Plaintiff argues that if it was proper for the ALJ to discount Dr. Bremer's opinion on this basis, than he also should have rejected the findings provided by Keith Kreuger, Ph.D. – who assessed her mental functional capacity using the same state agency form Dr. Bremer used – instead of giving those findings "greater weight." See Tr. 31, 159-62.  As clearly can be seen, however, Dr. Krueger's hand-written notations are far more extensive than those of Dr. Bremer. See Tr. 159-62.  While plaintiff asserts Dr. Krueger's hand-written notations are also barely legible, again though admittedly not the easiest to read, they too can be discerned.

With respect to Dr. Bremer's mid-January 2007 findings and opinion, however, the Court finds the ALJ's reasons for rejecting them were not proper.  First, although it may be that plaintiff was aware of the significance of the evaluation in the determination of her eligibility for disability benefits at the time it occurred, this does not in itself mean the emotion she expressed during the evaluation was not real.  Indeed, it may very well be that plaintiff "anticipated being 'emotional'" at the evaluation, because she knew she would be dealing with difficult psychological issues, rather than because of any desire to be untruthful.  As discussed above, the record itself shows that plaintiff has had a history of depression and suicidal ideation.

The ALJ's statement that plaintiff's outward appearance during the evaluation did not necessarily reflect her actual functioning under ordinary circumstances also failed to properly take into account the

1   ability of Dr. Bremer, an examining psychologist, to evaluate plaintiff.  Dr. Bremer gave no indication that

2   he felt plaintiff was not being truthful in her presentation or otherwise was engaging in malingering.  Nor

3   did the ALJ point to other specific medical evidence in the record which would call into question

4   plaintiff's presentation at the time.  An ALJ may not reject the findings and opinions of an examining

5   psychologist merely because he or she disagrees with them.  The ALJ thus erred in rejecting Dr. Bremer's

6   mid-January 2007 opinion for these reasons.

7          Although a good performance on formal psychological testing can form a valid basis for rejecting

8   an examining psychologist's opinion, here all the testing showed was plaintiff's intellectual functioning

9   was in the average range.  The ALJ failed to explain how this discounts the mental limitations not dealing

10  strictly with intellectual functioning, such as her limited ability to work with others or the public, that Dr.

11  Bremer found plaintiff had.  Nor does the Court see how such formal psychological testing itself indicates,

12  as found by the ALJ, that plaintiff is capable of responding appropriately to changes in a routine work

13  setting, completing a normal workday or workweek or performing at a consistent pace, particularly when

14  Dr. Bremer's own evaluation of plaintiff, including her test results, indicated significant limitations in

15  those areas.  Again, the ALJ failed to set forth his basis for this finding, which was error.

16         The ALJ's last stated reason for rejecting Dr. Bremer's mid-January 2007 opinion is defective as

17  well.  The ALJ found Dr. Bremer's assessment of plaintiff's social interaction skills was inconsistent with

18  her reported activities.  The specific activities the ALJ cites, however, are not necessarily incompatible

19  with the limitations on interacting with co-workers, supervisors and the public found by Dr. Bremer.  For

20  example, living or interacting with one's immediate family members or friends does not alone indicate an

21  ability to interact with other individuals not so well known in less supportive settings.  In addition, while

22  going to church may involve interacting with others, such is not always the case, and, in any event, the

23  ALJ made no finding as to the frequency and manner in which plaintiff attended church.

24         C.     Dr. Johnson

25         At the hearing, Dr. C. Richard Johnson testified that plaintiff's primary diagnosis was a personality

26  disorder, which pre-dated her substance abuse disorder. Tr. 426.  During the period plaintiff was abusing

27  substances, however, Dr. Johnson testified that her substance abuse problem was prominent and therefore

28  material.  Id.  He testified that a borderline personality disorder also was present during the time plaintiff

was abusing substances. Id.  In addition, Dr. Johnson testified that "prior to and maybe even during the time" the abuse occurred, plaintiff was "pretty productive occupationally," but that eventually it "caused her then to not be able to function occupationally on a regular basis." Tr. 427.  Dr. Johnson further testified that plaintiff was moderately restricted in her activities of daily living, that she had moderate difficulties in her social functioning and in maintaining concentration, persistence and pace, and that there had been no episodes of decompensation of extended duration. Tr. 430.

The ALJ stated that he gave greater weight to the testimony of Dr. Johnson than the opinions of Dr. Bremer, because it was "more consistent with the longitudinal medical record and the reported activities," and because it was based on his review "of the majority of the record" and on plaintiff's testimony. Tr. 31-32.  Plaintiff argues the ALJ erred here by ignoring important aspects of Dr. Johnson's testimony.  Plaintiff points out, for example, that Dr. Johnson testified that since plaintiff stopped using methamphetamine on a sustained basis, her primary diagnosis was personality disorder, and that with the level of severity at which plaintiff's disorder was present, stress levels would be expected to be "variable and somewhat intense and explosive, especially in the presence of interpersonal stressors." Tr. 438.

The Court agrees this is significant probative evidence the ALJ failed to adequately address or apparently consider.  This was error.  Plaintiff further argues Dr. Johnson testified that the low GAF scores in the record with which plaintiff was assessed would indicate an inability to sustain competitive work. While true, plaintiff leaves out an important portion of Dr. Johnson's testimony.  Dr. Johnson in actuality testified that "according to the GAF scores, she probably would not" sustain such employment, and then noted that there was "a disparity" between those scores and the severity of the mental condition with which plaintiff was diagnosed at the time. See Tr. 437-38.  So it is not entirely clear that Dr. Johnson felt the GAF scores were an accurate indicator of plaintiff's level of functioning.  Nevertheless, given that, as discussed above, the ALJ failed to properly address the scores assessed by Dr. Crabbe and Dr. Sattar, this portion of Dr. Johnson's testimony needs to be addressed on remand as well.

Plaintiff argues that if the ALJ truly preferred the testimony of Dr. Johnson, than she should have found her to be disabled.  As just discussed, however, while the ALJ did err in evaluating the testimony of Dr. Johnson for the reasons set forth above, that testimony hardly definitively supports plaintiff's claim that she is unable to perform or sustain any competitive work.  Rather, further consideration of Dr.

1    Johnson's testimony in the context of the other medical evidence in the record is required.  Accordingly,

2    remand for such additional administrative action is appropriate.

3    II.     The ALJ's Assessment of Plaintiff's Credibility

4           Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

5    639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749

6    F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is

7    based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

8    claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as

9    long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148

10   (9th Cir. 2001).

11          To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

12   the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must

13   identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.;

14   Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

15   malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

16   Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v.

17   Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

18          In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

19   evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

20   testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

21   also may consider a claimant's work record and observations of physicians and other third parties

22   regarding the nature, onset, duration, and frequency of symptoms. Id.

23          The ALJ discounted plaintiff's credibility in part for the following reason:

24          [T]he claimant has described daily activities which are not limited to the extent one
            would expect, given the complaints of disabling symptoms and limitations.  For
25          instance, in January 2003, the claimant reported that she wrote in a journal, read a book
            occasionally, and performed a housecleaning job occasionally . . . In January 2004, she
26          reported eating properly and riding a bike.  She stated that her mental impairments did
            not cause any problems to her daily living skills . . .  In March 2004, she told Dr.
27          Thurman that she fixed something to eat during the mornings, showered, went to a group
            meeting from 6:00 to 9:00 PM on Monday, Tuesday, and Thursday, spent time with
28          some family members, had a significant other who visited her or who she talked to on
            the phone, had another friend who stopped by from time to time, did the laundry

ORDER
Page - 12

occasionally, and shopped with her mother . . .  In June 2004, the claimant reported that her two teenage children were living with her for the summer . . .

In December 2004, she stated that she was seeing her children on the weekends regularly . . . In February 2005, the claimant reported that she was about to complete a substance abuse treatment program at the Eugenia Center . . .  In December 2005, the claimant stated that she played a hand-held solitaire game "quite a few" hours per day, could spend several hours on [sic] per day on the Internet if she had Internet connection, had the television on all day and night, had spent time with her children, ages 15 and 16, during their Christmas break, and spoke with her sister and a friend . . .  In March 2006, she acknowledged that "I am limited with physical problems but still able to [perform her activities of daily living]."  She stated that she could still drive and that she walked outside for exercise . . .  In June 2006, she reported residing temporarily with her mother . . . Later that month, she reported moving into a travel trailer on her friend's property . . . In July 2006, she stated that she was staying at a friend's barn until her mother returned from a vacation . . .

At the hearing, the claimant reported that she had moved back into her mother's house.  She stated that she watched television most of the day, read, played Solitaire on the computer, saw a few friends, went to church, usually saw her children every couple of weeks, and spent time with her mother, who helped her deal with day to day things.  When her children visited, she watched movies and played games with them.  She also prepared meals with her daughter's help.

In January 2007, the claimant informed Dr. Bremer that she took short walks around the block, rode a bike, and performed a couple of chores, including loading the dishwasher, dusting, and doing the laundry.  She alternated cooking with her mother or they cooked together.  She described a socially isolated life, but acknowledged that she spent time with her children, her mother, and a few friends . . .

Tr. 28-29.  Plaintiff argues this is an invalid basis for discounting her credibility, asserting that the mere fact that she may have "carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way distract from" her credibility as to her alleged disability.  See Webb v. Barnhart, 433 F.3d 683, 688 (9th Cir. 2005).

To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities.  Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting."  Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and, as noted above, "many home activities may not be easily transferable to a work environment."  Id.

The Court agrees that a number of the activities the ALJ noted have not been shown to have been performed to the extent or for a duration indicative of an ability to spend a substantial part of the day performing activities transferable to a work setting.  Other activities and evidence that the ALJ pointed to,

1   however, do provide a greater indication of such an ability.  For example, performing a housecleaning job,

2   albeit on occasion, does indicate a greater than alleged ability to perform work-related activities, and

3   riding a bike contradicts plaintiff's claims of lower extremity weakness.  Further, the ALJ noted that on at

4   least one occasion she reporting having no problem with her activities of daily living.  So too is her

5   reported ability to spend apparently several hours a day each playing a computer game and being on the

6   internet inconsistent with her claims of total disability.  Accordingly, the Court finds the ALJ overall did

7   not err in discounting plaintiff's credibility for this reason.

8          The ALJ also discounted plaintiff's credibility because the medical evidence in the record did not

9   support her allegations of chronic disabling symptoms and limitations, finding specifically in relevant part

10  as follows:

11          Records prior to February 2004 reflect only treatment for amenorrhea, high blood
            pressure, and seasonal allergic rhinitis . . .  Records after February 2004 reveal fairly
12          normal physical examinations and no positive diagnostic findings.  As noted by her
            treating physician, Dr. Kooiker, the claimant's physical complaints are purely
13          subjective . . .

14  Tr. 29.  This is a legitimate basis for discounting a claimant's credibility. See Regennitter v. Commissioner

15  of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998) (determination that claimant's complaints are inconsistent

16  with clinical observations can satisfy clear and convincing requirement).  Since plaintiff has alleged an

17  inability to work at least in part because of a physical impairment, the ALJ did not err in discounting her

18  credibility on this basis.

19         Plaintiff argues in so discounting her credibility for this reason, the ALJ both used circular logic

20  and applied the incorrect legal standard.  Specifically, she asserts that in assessing her credibility, the ALJ

21  first must determine whether there is objective medical evidence of an impairment that reasonably could

22  be expected to produced some degree of the symptoms alleged.  This is correct. See Cotton v. Bowen, 799

23  F.2d 1403 (9th Cir. 1986); Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir.1991) (en banc)) (claimant must

24  produce medical evidence of underlying impairment which is reasonably likely to be cause of alleged

25  pain).  Plaintiff next asserts that the ALJ then must assess her credibility concerning the severity of her

26  symptoms that is separate form the extent of support therefor contained in the medical evidence.  To allow

27  otherwise, plaintiff argues, is improper.  This is an incorrect reading of the law.

28         Determining whether there is a sufficient medical basis for the existence of an impairment which

ORDER
Page - 14

1  could be expected to cause the degree of symptoms alleged is distinctly different from a determination as

2  to whether the medical evidence in the record overall supports that degree.  That is, the first step in

3  assessing a claimant's credibility is concerned with the question of whether there is an actual medically

4  determinable impairment that <u>could</u> cause the alleged symptoms.  It is not a finding that those symptoms

5  <u>are</u> caused or consistent with evidence of the underlying impairment.  This is because a claimant must have

6  a medically determinable impairment in order to be entitled to disability benefits. <u>See</u> <u>Tackett v. Apfel</u>,

7  180 F.3d 1094, 1098 (9th Cir. 1999) (claimant must show he or she suffers from medically determinable

8  impairment that can be expected to result in death or that has lasted or can be expected to last for

9  continuous period of not less than twelve months).

10       It is only after the presence of such an impairment has been determined that the ALJ then goes on

11  to determine whether the evidence in the record, medical or otherwise, actually supports the alleged degree

12  of disability or limitation.  This is why, as noted above, the Ninth Circuit expressly has held that

13  determining that a claimant's complaints are inconsistent with the objective medical evidence in the record

14  can satisfy the clear and convincing requirement. <u>See</u> <u>Regennitter</u>, 166 F.3d at 1297.  The only limitation

15  on the ALJ's use of this as a reason for discounting a claimant's credibility is that the claimant's testimony

16  may not be rejected <u>solely</u> because the degree of symptoms alleged is not supported by objective medical

17  evidence. <u>See</u> <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir.2001); <u>Byrnes v. Shalala</u>, 60 F.3d 639,

18  641-42 (9th Cir. 1995); <u>Orteza v. Shalala</u>, 50 F.3d 748, 749-50 (9th Cir. 1995); <u>Bunnell v. Sullivan</u>, 947

19  F.2d 341, 346-47 (9th Cir.1991) (en banc)).  This is because to allow otherwise "'would render

20  meaningless' the requirement that" the ALJ "consider all relevant evidence," not just that which is

21  medical. <u>Bunnell</u>, 947 at 347 (citation omitted).  Plaintiff's analysis would overturn longstanding Ninth

22  Circuit precedent on this issue.

23       The ALJ further discounted plaintiff's credibility because the record reflected that there had been

24  "no treatment" for plaintiff's "alleged arthralgias or myalgias until February 2004," and because there was

25  no evidence in the record of any mental health treatment until January 2003, despite an alleged onset date

26  of disability of October 20, 2001. Tr. 29.  The ALJ also found plaintiff had not been fully compliant with

27  her prescribed medications. <u>Id.</u>  Failure to assert a good reason for not seeking, or following a prescribed

28  course of, treatment, or a finding that a proffered reason is not believable, "can cast doubt on the sincerity

1    of the claimant's pain testimony." <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989).

2           Plaintiff argues this is not a legitimate basis on which to discount her credibility, because her

3    failure to seek and comply with treatment were part of her mental illness, and the Ninth Circuit has found

4    that the fact that a claimant does "not seek treatment for a mental disorder until late in the day" is not a

5    proper basis on which to find a claimant not credible regarding that condition. <u>Nguyen v. Chater</u>, 100 F.3d

6    1462, 1465 (9th Cir. 1996) (noting that those with depression often do not recognize their condition

7    reflects potentially serious mental illness).  While this may explain why plaintiff did not seek mental health

8    treatment earlier, it does not explain why she waited over three years after her alleged onset disability date

9    to seek treatment for the physical problems she claimed in part as a basis for her allegations of disability.

10   Nor does it explain her later failure to comply with treatment.  As such, the ALJ did not err in discounting

11   plaintiff's credibility for these reasons.

12          The ALJ also did not err in discounting plaintiff's credibility because her mental health treatment

13   records for the period of January 2003 through October 2006, indicated that "counseling and psychotropic

14   medications were generally helpful." Tr. 29.  An ALJ may discount a claimant's credibility on the basis of

15   medical improvement.  <u>See</u> <u>Morgan v. Commissioner of Social Sec. Admin.</u>, 169 F.3d 595, 599 (9th Cir.

16   1999); <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998).  Plaintiff argues this was not a valid reason,

17   asserting that it did not help her sufficiently enough for her to work.  However, those records do show that

18   plaintiff's symptoms and ability to function largely have improved with use of medication. Tr. 181-82,

19   192, 196-97, 199, 209, 213, 225, 234, 240, 278, 280-81.  Indeed, plaintiff reported at one point in late

20   October 2006, that she "[h]ad no problems or complaints regarding her mental health." Tr. 352.  This

21   evidence does call into question plaintiff's allegations of total disability.

22          In addition, the ALJ discounted plaintiff's credibility for the following reasons:

23   The claimant also has a longstanding history of drug and alcohol abuse, which makes it
     difficult to clearly determine the actual severity or impact of her mental impairments.
24   This is further compounded by the numerous inconsistent statements she has made
     regarding her substance use.  For instance, in January 2004, she stated that she had
25   been sober for 247 days.  In May 2004, she stated that she had been sober for 352 days.
     The record, however, reveals that she had a positive urine analysis test in October 2003
26   . . . In December 2005, she told Keith Krueger, Ph.D., that she last consumed alcohol in
     June 2005.  Dr. Krueger, however, recalled an earlier September 2005 evaluation in
27   which the claimant admitted to alcohol consumption two weekends earlier . . . In April
     2006, the claimant reported that no methamphetamine use in three years.  At the
28   hearing, however, she testified that she last used methamphetamines in June or July
     2005 . . . Even this testimony is contradicted by the record, which reveals a positive

ORDER
Page - 16

1    test for methamphetanmines in December 2005 . . .

2    Tr. 29-30.  Plaintiff argues that although her reports and testimony regarding her drug and alcohol use may

3    contain inconsistencies, they are not as significant as suggested by the ALJ.  The Court, however, finds the

4    ALJ did not err here.  It is true that the 247 days of sobriety plaintiff reported in January 2004, is not all

5    that inconsistent with the 352 days of sobriety she reported in May 2004.  As pointed out by the ALJ

6    though, plaintiff did have a positive urine analysis in October 2003.  Plaintiff states that she reported this

7    positive result herself, but the record does not show that it was she who did so, instead of that information

8    being gleaned from elsewhere in the record.  See Tr. 263.

9         Plaintiff suggests that because there is no record of a September 2005 evaluation, it is possible that

10   Dr. Krueger had confused her with another claimant when he noted plaintiff had admitted at that time to

11   consuming alcohol two weeks earlier.  While it is true there does not appear to be a documentation of a

12   September 2005 evaluation in the record, that does not necessarily mean Dr. Krueger was mistaken as to

13   who he was referring.  Regardless, the ALJ was not remiss in finding plaintiff to be inconsistent in her

14   report of three years of sobriety in April 2006.  Plaintiff claims she reported the December 2005 test to Dr.

15   Sattar at the time, but a review of the record does not support this claim.  See Tr. 376.  In any event, this is

16   still inconsistent with her testimony at the hearing of having last used methamphetamines in June or July

17   2005.  Such inconsistencies thus further support the ALJ's credibility determination.

18        Lastly, the ALJ discounted plaintiff's credibility for the following reason:

19             . . . [T]he claimant has made inconsistent statements regarding her physical
               impairments.  At the hearing, she testified that she could not drive because she was
20             afraid her legs would give out.  In June 2006, however, she reported that she could not
               drive her vehicle because it had broken down.  She also stated that she had her driving
21             privileges jeopardized because of a misuse of pain medications . . .

22   Tr. 30.  Plaintiff does not challenge this stated reason for discounting her credibility.  The Court also finds

23   it to be a valid reason.  Smolen, 80 F.3d at 1284 (ALJ may consider ordinary techniques of credibility

24   evaluation such as prior inconsistent statements concerning symptoms in credibility determination).  Thus,

25   the Court finds the ALJ's credibility determination to be valid.

26   III.    The ALJ's Step Five Analysis

27        If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

28   process the ALJ must show there are a significant number of jobs in the national economy the claimant is

1    able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), §

2    416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the

3    Commissioner's Medical-Vocational Guidelines (the "Grids").  Tackett, 180 F.3d at 1100-1101; Osenbrock

4    v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

5            An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

6    posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

7    1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

8    medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

9    Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported

10   by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from

11   that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th

12   Cir. 2001).

13           The ALJ in this case found plaintiff to be capable of performing other jobs existing in significant

14   numbers based on the hypothetical describing an individual with plaintiff's limitations she posed to the

15   vocational expert, and the vocational expert's response thereto. See Tr. 33, 440-42.  Plaintiff argues the

16   ALJ erred by failing to include in the hypothetical question any handling, fingering or reaching limitations

17   she described were caused by her chronic pain syndrome.  However, plaintiff points to no medical

18   evidence in the record to support any such limitations.  In addition, as discussed above, the ALJ properly

19   discounted plaintiff's credibility, and in particular with respect to her physical impairments, and thus was

20   not required to adopt the limitations plaintiff now argues should have been adopted.

21           On the other hand, plaintiff points out that the ALJ failed to include the specific mental limitations

22   found by Dr. Bremer, or even those found by Dr. Krueger, despite the ALJ's statement that he was giving

23   greater weight to the latter's. See Tr. 31.  The Court agrees the ALJ erred at step five with respect to this

24   medical opinion evidence.  As discussed above, the ALJ erred in evaluating the mid-January 2007 findings

25   and opinion of Dr. Bremer.  Further, Dr. Krueger found plaintiff to be moderately limited in her ability to

26   exercise judgment and make decisions, relate appropriately to co-workers and supervisors and respond

27   appropriately to and tolerate the pressures and expectations of a normal work setting, though with respect

28   to the severity of this last limitation, Dr. Krueger appeared to have been unsure. Tr. 161.  Although the

hypothetical arguably took into account these moderate limitations, it is not entirely clear that it does so. See Tr. 441.  Because of this, and because the ALJ erred in evaluating Dr. Bremer's findings and opinion, the Court cannot say the hypothetical question contains all of plaintiff's limitations.

Plaintiff argues the vocational expert testified that any significant limitation in the ability to tolerate the pressures and expectations of a normal work setting would preclude competitive work, implying that she should have been found disabled at step five given the limitations in this ability both Dr. Bremer and Dr. Krueger found she had.  However, the term "significant" was not defined by plaintiff's attorney who posed the question to the vocational expert, nor by the vocational expert in his response to that question. See Tr. 443-44.  In addition, as noted above, Dr. Krueger's evaluation report indicates he may not have been completely sure plaintiff was moderately limited in this area, and, though the ALJ erred in evaluating Dr. Bremer's findings and opinion, it is not at all clear in light of the medical evidence in the record as a whole, that the ALJ would be required to adopt them.[3]

IV.     Remand for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

---

[3]For example, in late March, 2004, Harold C. Thurman, M.D., who also conducted a psychiatric evaluation of plaintiff, opined as follows:

> . . . The claimant does have the ability to perform simple and repetitive tasks . . . Additionally I estimate she should be able to perform work activities on a consistent basis without any special or additional supervision as long as she remains sober.  It is my clinical opinion that she can maintain regular attendance in the workplace and complete a regular workday and workweek without any interruptions from her psychiatric condition.  As long as she remains sober, she should be able to deal with most of the stressors usually encountered in competitive work.

Tr. 155.

ORDER
Page - 19

(1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain with respect to the medical evidence in the record and plaintiff's ability to perform other jobs existing in significant numbers in the national economy, it is appropriate to remand this matter to the Commissioner for further administrative proceedings.

<u>CONCLUSION</u>

Based on the foregoing discussion, the Court finds the ALJ improperly determined plaintiff was not disabled. Accordingly, the ALJ's decision hereby is REVERSED and REMANDED to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

DATED this 16th day of June, 2008.


Karen L. Strombom
United States Magistrate Judge

ORDER
Page - 20